Edward C. DENNENY and
Catherine Denneny

v.

Bernard SIEGEL and Louis H. Block and
Albert Einstein Medical Center,
Northern Division.

Civ. A. No. 31383.

United States District Court
E. D. Pennsylvania.

Dec. 1, 1967.

F. Hastings Griffin, Jr., Philadelphia, Pa., for plaintiff.

Albert C. Gekoski, Philadelphia, Pa., for Albert Einstein Medical Center.

Aaron D. Blumberg, Philadelphia, Pa., for Louis H. Block, M.D.

G. Wayne Renneisen, Philadelphia, Pa., for Bernard Siegel, M.D.

OPINION

FULLAM, District Judge.

On October 23, 1967, after three days of trial, I granted the motion of the defendant hospital for a directed verdict under Rule 50, and entered various other orders, the effect of which was the entry of final judgments adverse to the plaintiffs. This opinion is being filed in order to record more fully the reasons for the actions taken.

Plaintiffs' evidence disclosed that the wife-plaintiff has been under medical care most of the time for the past twenty or more years. During that period, she has undergone a remarkable number of operative procedures, including the removal of a kidney in about the year 1947, a tonsillectomy in 1949, and three separate ulcer operations in 1953 or thereabouts. In 1957 and 1958, she was under the care of a Dr. Helene Young (in the Buffalo, New York, area) for various problems, including a suspected heart condition. In 1958, she was advised by Dr. Young that, because of her medical history up to that point, it would be most unwise for her to undergo any further abdominal surgery unless absolutely necessary.

In 1960, while residing in the Philadelphia area, plaintiff experienced re-

curring abdominal symptoms, including vaginal bleeding, and was referred to a gynecologist, the defendant Bernard Siegel, M.D., who performed a "D & C" operation on the plaintiff in November of that year. During the early part of 1961, plaintiff again experienced excessive menstrual bleeding, and Dr. Siegel advised that a hysterectomy be performed. Because of the weakened condition of plaintiff's abdominal wall as a result of her previous abdominal surgery, Dr. Siegel indicated that he would perform a vaginal hysterectomy, i. e. without any further incisions in the abdominal wall; and it was on this basis that the plaintiff and her husband consented to the operation. Plaintiff was admitted to the Einstein Medical Center, Northern Division, on June 2, 1961, for the purpose of having this operation performed.

By way of further background, it should be mentioned that the plaintiff has been overweight, to a greater or lesser degree, for many years. At the time of her admission to Einstein, she weighed approximately 200 pounds, and was five feet three inches tall.

Dr. Siegel began the operation according to plan, on June 6, 1961. However, when the operation was nearly completed, one of the abdominal arteries tore loose from the clamp which was holding it and retracted into the abdominal cavity. Dr. Siegel attempted to control the resulting hemorrhaging with vaginal packs, etc., but in order to prevent the plaintiff from bleeding to death, it was necessary for him to make an incision in the abdominal wall in order to locate the loose artery and tie it off. It finally became necessary for him to tie off the main abdominal artery, rather than just the branch which had torn loose. Plaintiff was in the intensive care unit for a period of two weeks, but began to recover from this operation, although there were continuing problems of bowel obstruction due to the vaginal packing.

Later, a second operation became necessary, because the incision from the first operation had opened and a loop of intestine was protruding through the aperture. This was repaired on June 17. Up to this point, all of Dr. Siegel's incisions were made in the left side of plaintiff's abdomen.

On Sunday, July 2, 1961, plaintiff began hemorrhaging, and a further operation was required in order to save her life. This time, the incision was made in the right side of plaintiff's abdomen, and the necessary repairs were made principally by the defendant, Louis H. Block, M.D., although the early part of the operation was performed by Dr. Siegel.

Thereafter, an infection developed in the incision on plaintiff's right side, and it did not heal properly. When she left the hospital in order to return to Buffalo, New York, on July 23, 1961, this incision was still open and some signs of infection were still present. After additional hospitalization in Buffalo, the infection cleared up and the various incisions healed, leaving extensive scars and further abdominal weakness.

To round out the factual background, it should be mentioned that the plaintiff has experienced at least three additional and unrelated hospitalizations during the years since 1961.

Plaintiffs' claims against the two physician defendants were settled before trial, and joint-tortfeasor releases given. Thus, the crucial issue at trial was whether the plaintiff had succeeded in proving a case against the hospital. Plaintiffs' claim against the hospital relates solely to the infection which developed in the abdominal incision in her right side, following the operation of July 2, 1961.

It was the theory of plaintiffs' case that the defendant hospital was negligent in permitting unauthorized persons in street clothing to enter the operating room where plaintiff was about to be operated upon, and that this violation of hospital regulations caused the infection which subsequently developed. It appears from the testimony that the plaintiff was in a semi-private room at the hospital, with a private-duty nurse in attendance. When it became

necessary to rush her to the operating room the nurse was unable to locate any hospital personnel to assist in that task, and she recruited the daughter of the other patient in plaintiff's room, who happened to be visiting at the time, to assist her in wheeling the patient into the elevator and from the elevator into the operating room area. Although it requires a strained interpretation of the evidence, I shall assume for purposes of present discussion (1) that the hospital was responsible for the actions complained of; (2) that the unauthorized visitor actually entered the operating room as the plaintiff was being wheeled into it; and (3) that under all of the circumstances a jury might properly conclude that the hospital was negligent. But the plaintiffs have entirely failed to prove any causal relationship between the alleged negligence and the ensuing infection.

Plaintiffs presented the testimony of two medical witnesses on this point. Dr. Helene Young, who examined the plaintiff upon her arrival at Buffalo on July 23, 1961, and whose deposition was read into the record at trial, stated that, at that late date, it was impossible to tell what had caused the infection. (Deposition, p. 44). The defendant, Dr. Siegel, called as a witness for the plaintiffs, testified that some infection developed after the operation of June 6, 1961, and also after the operation of June 17, 1961; that when the incision in the right side was made on July 2, 1961, there was already infection present within the abdomen; and that this was not unusual, but was a complication that "could be expected under the circumstances." (N.T. pp. 159, 191–193). He assigned as reasons for all of the incisions becoming infected:

"Well, the loss of blood depriving the tissues of food, which the blood carries, the presence of a large amount of fat, reducing the ability of the wound to heal properly, the extensive surgical procedure reducing the health of the tissues; these factors all together played a large part in interfering with the normal healing process of the abdominal wound." (N.T. p. 192).

Dr. Siegel also testified flatly that at no time during her entire hospital stay from June 2, 1961 until July 23, 1961, did the plaintiff ever develop any staphylococcus infection or "hospital staph." (N.T. p. 194). Plaintiffs' counsel sought to neutralize the doctor's testimony on this point by calling his attention to a reference to staphylococcus in a report of the hospital's pathology laboratory; however, the doctor interpreted the pathology report as indicating merely a minimal quantity of staphylococcus germs. He did not alter his previously-expressed views that the plaintiff never had a staphylococcus infection, and that the post-July 2 infection was the same type as the pre-existing infections.

At the close of plaintiffs' case, not a single witness had testified that the alleged intrusion by an improperly clad outsider, or any other alleged negligence on the part of the hospital, had any causal connection to the injury complained of, i. e. the post-July 2 infection; and the only witness who testified at all on that issue negatived the existence of a causal connection. Clearly, plaintiffs did not meet their burden of proof.

■■ Pennsylvania law is applicable. It is my opinion that under the law of Pennsylvania, expert medical testimony was required in this case to establish the cause of the infection complained of.

"In a personal injury action, if the injuries are not immediately and directly, or naturally and probably, the result of the alleged cause, and the facts from which causal connection may be found are not testified to with such clearness and definiteness that laymen in the ordinary affairs of life can infer the cause from the proved effect, expert testimony is necessary to establish the causal connection." 15 P.L.E., Evidence, § 388.

This was not a case where the "sequence of events strongly indicates a causal connection", or a case of "a perfectly obvious injury which a layman could diagnose * * * [where] the accident

and the injury were so closely connected, and so quickly apparent, that the circumstances themselves justified submission to the jury", as in Tabuteau v. London Guarantee and Accident Company, Ltd., 351 Pa. 183, 40 A.2d 396 (1945), and Stracka v. Mosko, 99 Pa.Super. 463 (1930). Rather, the present case is in the same category as the line of cases headed by Vorbnoff v. Mesta Machine Co., 286 Pa. 199, 133 A. 256 (1926).

Laymen cannot be expected to have sufficient knowledge to reach a sound conclusion on the issues of causation presented by the present case; in many respects, the issue here is analogous to the requirement in the Pennsylvania cases of expert evidence to establish medical negligence itself. See, for example, Lambert v. Soltis, 422 Pa. 304, 221 A.2d 173 (1966), and the cases there cited. As long ago as Dushane v. Benedict, 120 U.S. 630, at page 647, 7 S.Ct. 696, 30 L.Ed. 810 (1887) it was held that lay witnesses were "clearly incompetent" to testify that certain infected rags were the cause of smallpox; not because such testimony would invade the province of the jury, but because the witnesses were ordinary workmen "not shown to be experts."

█ Moreover, even if plaintiffs had produced a medical expert to testify with the definiteness and certainty required by *Mesta,* supra, it is doubtful that the case could properly have been submitted to the jury under Pennsylvania law, which holds that it is fatal to a plaintiff's case if there are absolute contradictions in the ultimate conclusions reached by plaintiff's experts on a key issue. Mudano v. Philadelphia Rapid Transit Co., 289 Pa. 51, 137 A. 104 (1927); Menarde v. Philadelphia Transportation Co., 376 Pa. 497, 501, 103 A.2d 681 (1954).

And finally, even if it were to be held that expert testimony was not required in this case, I am satisfied that no inference of causation can reasonably be drawn from the evidence in this case, and that no finding of causation could be permitted to stand. Any such finding could only be based upon wild speculation, in complete disregard of plaintiffs' own uncontradicted evidence.

For the foregoing reasons, the motion of the hospital defendant for a directed verdict was granted. Summary judgments in favor of the physician defendants were entered without objection, on the basis of the pleaded releases; and the cross-claims were dismissed.